J. S14011/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
v.   :
  :
JULIO ANGEL ORTIZ-LUGO,   :   No. 1015 MDA 2015
  :
Appellant   :

Appeal from the Judgment of Sentence, April 29, 2015,
in the Court of Common Pleas of Berks County
Criminal Division at No. CP-06-CR-0000797-2014

BEFORE: FORD ELLIOTT, P.J.E., PANELLA, J., AND STEVENS, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED APRIL 01, 2016**

Julio Angel Ortiz-Lugo appeals from the judgment of sentence in which he was sentenced to serve a term of life imprisonment for first degree murder, was concurrently sentenced to a term of life imprisonment for second degree murder, and concurrently sentenced to a term of one to five years for possession of instruments of crime.[1] Appellant received credit for 488 days time served. He was also ordered to pay costs of $8,139.75.

On November 16, 2013, Aida Flores ("Flores"), the lessee of 504 Minor Street in the City of Reading, Pennsylvania, hosted a number of people. Her son Brandon Troncoso ("Troncoso"); and daughter, Nayaliz Flores; her

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(A), 18 Pa.C.S.A. § 2502(B), and 18 Pa.C.S.A. § 907 respectively.

boyfriend, appellant; Lizmar Torres ("Torres"); and Juan Carlos Lopez Bonilla ("Bonilla"). That day, Flores and appellant had a disagreement. Flores told appellant to leave. (Notes of testimony, 3/16-18/15 at 114-115.) That evening, Flores invited her nephew, Jaxel Flores, over to have pizza and spend the night. (*Id.* at 122.)

At approximately 10:00 or 11:00 p.m., Flores left her house to meet her godmother and have a few drinks. When she returned home at approximately 3:00 a.m., only Torres and Bonilla were awake. Torres prepared some food and then went upstairs to her bedroom where her children were sleeping. Torres then fell asleep herself. (*Id.* at 121-123.)

Later, Troncoso woke up Torres, by screaming, "Dundy, what are you doing here?"[2] (*Id.* at 123.) Apparently, appellant entered the house by breaking and entering through a bathroom window. Appellant grabbed Torres' phone and ran downstairs. Troncoso followed him. After checking on the safety of her daughter, Torres went downstairs. She saw a bloody Bonilla on the sofa asking for help. Appellant was no longer in the house, and the front door was open. (*Id.* at 127-129.) The police were summoned. Bonilla soon died. The police interviewed Flores, and she admitted that appellant was her ex-boyfriend. The videotape of this interview was subsequently played at appellant's trial. (*Id.* at 150.)

---

[2] Appellant was also known as "Dundy."

Appellant was arrested and charged with first, second, and third-degree murder, burglary, two counts of aggravated assault, and possession of the instruments of a crime.

Appellant's trial commenced on December 4, 2014. Torres testified that she came to live with Flores after she was evicted and that she lived on the third floor of the house. (***Id.*** at 80.) Torres testified that at around 3:00 or 4:00 a.m. on November 17, 2013, she got up to get milk for her child. She saw appellant and Bonilla fighting in the living room. She did not see any weapons but noticed that there was blood on Bonilla's sweatshirt, appellant's sweatshirt, and appellant's left hand. (***Id.*** at 82-84.) The Commonwealth introduced a videotape of Torres' interview with the Reading Police on November 17, 2013, in which she stated that appellant had a knife which she described and demonstrated a stabbing motion. (***Id.*** at 95.)

Jaxel Flores testified that he was at Flores' house on the night of the killing. He went to bed at between 2:00 to 3:00 a.m. (***Id.*** at 36, 39.) He was awakened sometime later when he heard glass breaking. He then heard Torres screaming, "Dundy, no, don't do it." (***Id.*** at 40-41.)

Troncoso, who was 12 years old at the time of trial, testified that Bonilla stayed at his house for about three or four days because he was a friend of appellant's. Appellant left the house that day because he and Flores were fighting. (***Id.*** at 53.) That night, Troncoso went to bed in his mother's room at approximately 1:30 or 2:00 a.m. He, his sister, and his

mother were sleeping in that room. He woke up when he heard glass breaking in the bathroom. Troncoso then saw appellant running downstairs after appellant took Flores' phone. (*Id.* at 55.) Troncoso went downstairs and saw Bonilla with "blood all over the couch, on him, on his head, his hair." (*Id.* at 58.) Troncoso saw appellant leave and throw a knife down a drain outside. (*Id.* at 58.) In the midst of cross-examination, Troncoso stated, "I want to go. I don't want to be here no [sic] more." (*Id.* at 67.) After a brief recess, Troncoso continued with his father, Anthony Troncoso, standing behind him while he was on the witness stand. (*Id.* at 73.) Troncoso admitted that when he was interviewed by the police, he did not mention a knife. (*Id.* at 76.)

Officer Charles Federico ("Officer Federico") of the Reading Police Department testified that he responded to the call for a stabbing at Flores' residence. When he arrived, Officer Federico saw blood on the front door, Bonilla lying in a pool of blood, and two adults and five children. Troncoso told Officer Federico that Bonilla was the victim and that his "mom's ex-boyfriend [appellant]" stabbed him. (*Id.* at 154-156.) Torres told Officer Federico that appellant and Bonilla had an argument and "he [appellant] pulled out a knife and began to stab him." (*Id.* at 158.)

Other testimony included evidence that blood samples in the bathroom window, hallway, entrance way at Flores' house, and along the sidewalk along the front door of the house were tested for DNA which indicated that

the blood belonged to appellant. (*Id.* at 230-237.) Neil Hoffman, M.D. ("Dr. Hoffman"), a forensic pathologist, testified that Bonilla's death was caused by a penetrating stab wound that penetrated between the fifth and sixth ribs and into the pericardial sac and the left ventricle of the heart. (*Id.* at 247-249.) On cross-examination, Dr. Hoffman also testified that the wounds occurred during the course of a struggle. (*Id.* at 261-262.)

On March 18, 2015, the jury found appellant guilty of all charges. On April 29, 2015, the trial court issued its sentence.

On May 8, 2015, appellant filed a post-sentence motion and sought a new trial and/or arrest of judgment and/or judgment of acquittal. Appellant alleged the following:

1.  The verdicts are contrary to law.

2.  The verdicts are contrary to the evidence.

3.  The verdicts are contrary to the weight of the evidence.

4.  The evidence was insufficient to sustain the verdicts of guilty.

5.  The verdict of guilty to all counts of the information is contrary to the law, the evidence, the weight of the evidence, and the evidence is insufficient to sustain a verdict of guilty, and defendant is otherwise entitled to appropriate legal relief, for the following reasons:

    (a)  [Appellant] avers that given the equivocal and contradictory nature of the testimony of the witnesses presented by the Commonwealth,

> unsupported or corroborated by forensic evidence that the verdicts as to the homicide/assault are against the weight of the evidence.
>
> (b) The Commonwealth lacked sufficient admissible, reliable and credible evidence of identification that showed the defendant was in fact the perpetrator.
>
> (c) [Appellant] avers that the weight of the evidence may have established burglary and theft charges and thus his presence at the scene. However, the evidence as to his involvement in the homicide/assault was undercut where [,] although [Appellant's] blood was all over the house [,] none was apparently present on or about the body of the deceased.

Appellant's post-sentence motion, 5/8/15 ¶¶1-5 at 1-2.

By order dated May 14, 2015, the trial court denied the motion.

Before this court, appellant raises the following issues:

> A. Did the trial court err in failing, sua sponte, to conduct a competency examination for a child witness under the age of fourteen (14), make an independent determination of competency and make a specific finding that the witness possessed: (1) a capacity to communicate including both an ability to understand questions and to frame and express intelligent answers; (2) the mental capacity to observe the actual occurrence and the capacity of remembering what it is that he or she is called to testify about; and (3) a consciousness of the duty to speak the truth; thereby undercutting the truth determining process of the jury trial; therefore a new trial should be granted?

> B. Did the trial court err in denying Defendant's post sentence motion for a new trial as the verdicts were against the weight of the evidence, especially in light of the court's failure to conduct a competency determination of the Commonwealth's most important witness, a child under fourteen (14) years of age, and in light of [the] development that during the child's testimony the child's biological father directing the child off the stand during cross-examination and was then allowed to sit with the child after the child re-took the stand raising issues of undue influence and taint; therefore a new trial should be granted?
>
> C. Was there insufficient, competent evidence to support the verdicts of guilty as to the homicide counts of the information where the primary exculpatory witness was a child under fourteen (14) and no competency examination was conducted? (Capitalization omitted).

Appellant's brief at 7-8.

Before addressing the merits of appellant's arguments, this court must address the claim of the Commonwealth that appellant waived these issues when he did not raise them at trial.

Pa.R.A.P. 302(a) provides that only issues properly raised and preserved in the trial court will be considered on appeal.

This court has long held that "[a] claim which has not been raised before the trial court cannot be raised for the first time on appeal." *Commonwealth v. Lopata*, 754 A.2d 685, 689 (Pa.Super. 2000) (citing *Commonwealth v. Gordon*, 528 A.2d 631 (Pa.Super. 1987)).

Furthermore, it is well established that trial courts must be given an opportunity to correct any errors when they occur. A party may not complain of matters at a later time, when the party did not object at a time when the trial court could have corrected the alleged error. ***Commonwealth v. Strunk***, 953 A.2d 577, 579 (Pa.Super. 2008).

A review of the record reveals that appellant did not request a competency hearing or otherwise object when Troncoso took the stand. Further, appellant lodged no objection when the trial court allowed Troncoso's father to stand or sit behind him when Troncoso's cross-examination resumed after he said that he could not continue. Appellant also did not raise this issue in his post-sentence motion.

Although the trial court did address the merits of appellant's claims in its opinion, the trial court did state, "Additionally, it must be mentioned that Appellant's counsel '**never**' requested a competency hearing for the twelve (12) year old child witness at '**any time**' during this case and bears the consequences of that decision." (Trial court opinion, 9/10/15 at 6 (emphasis in original).)

We agree with the Commonwealth that appellant failed to properly preserve his challenge to the testimony of Troncoso. Appellant raises three issues before this court. All three relate to the issues of whether the trial court erred when it did not hold a competency hearing and whether Troncoso's father should have been permitted to be as close to Troncoso

during his cross-examination. As a result, appellant has waived all issues before this court, and we need not address the merits of his appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/1/2016